**Andrea N. Sanders NICOL, Plaintiff,**

v.

**AUBURN–WASHBURN USD
437, et al., Defendants.**

**Civil Action No. 01–2117–CM.**

United States District Court,
D. Kansas.

Nov. 7, 2002.

Ira Dennis Hawver, Ozawkie, KS, for Plaintiff.

M. Kathryn Webb, Richard W. James, McDonald, Tinker, Skaer, Quinn & Herrington, P.A., Robin E. Kluge, Wichita, KS, for Defendants.

## MEMORANDUM AND ORDER

MURGUIA, District Judge.

This case arises out of a physical altercation between defendant Jerald F. Targett, a school security officer at Washburn Rural High School ("Washburn Rural") in Topeka, Kansas, and plaintiff Andrea N. Sanders Nicol, a student at Washburn Rural. Following the events giving rise to this action, plaintiff filed suit against defendant Auburn–Washburn Unified School District 437 ("USD 437"), several employees of Washburn Rural, and one member of the USD 437 School Board. Plaintiff named the individual defendants in both their individual and official capacities as agents of defendant USD 437.

Following this court's order addressing defendants' motion to dismiss, several of plaintiff's claims remain pending. Plaintiff's remaining claims include those filed under 42 U.S.C. § 1983, wherein plaintiff claims defendants violated her rights under the Fourth Amendment to be free

from unreasonable seizure and violated her rights under the Fourteenth Amendment to receive substantive due process,[1,2] and plaintiff's state law claims of intentional infliction of emotional distress, assault, and battery.

Pending before the court is defendants' Motion for Summary Judgment (Doc. 63). As set forth below, defendants' motion is granted in part and denied in part.

## ● Facts[3]

### A. Plaintiff's Conduct and Altercation with Officer Targett

In September 1998, plaintiff was enrolled as a freshman at Washburn Rural. On the morning of September 30, 1998, plaintiff and two other students became loud and disruptive in the school hallway and were ordered to go to the office to meet with an administrator. The three girls reported to a conference room in the office, at which time plaintiff became angry. Plaintiff was mad about "gossip going around" and she was mad at another student.

Plaintiff requested that a male student be brought into the office for the conversation. Ms. Thornburgh, an Assistant Principal, told plaintiff that she was not going to bring the male student to the office and that personal issues needed to be kept out of school. The plaintiff then shouted at Ms. Thornburgh, "Stop screaming at me."

Ms. Thornburgh responded, "I am not shouting," The plaintiff then jumped up and shouted profanities at Ms. Thornburgh. Mr. David LaFevre, another Assistant Principal who was present during this exchange, directed plaintiff to report

to his office. Plaintiff responded to Mr. LaFevre with profanities and indicated that she was "going to call my mother." Plaintiff left the office yelling profanities directed at the school.

Plaintiff testified that she was then "allowed" to go to her classes and get her homework assignments. However, defendants testified that plaintiff was not instructed to go to her classrooms to get her assignments, but that plaintiff simply announced that she intended to get her assignments as she left the office.

Ms. Thornburgh contacted school security officer Jerald Targett to report to the commons area where plaintiff was making a telephone call. When plaintiff completed her phone call, she yelled profanities, again directed toward the school and its staff. Officer Targett testified that he approached plaintiff and her friend and requested that they leave the building. However, plaintiff testified that Officer Target "never told me just to leave the school." Instead, plaintiff testified that Officer Target "told me to get the fuck out of school and started to come after me." Plaintiff responded to Officer Targett's request by stating, "Fuck your fat ass, you better not come around me. My daddy told me you were a piece of shit." Plaintiff continued to taunt and harass Officer Targett and said, "What are you going to do? Throw a gun to a student and have them shoot us[?]"

Plaintiff and the other student then left the main office and commons area and proceeded toward the attendance area. Officer Targett believed the students were

---

**1.** Count 2 of plaintiff's complaint also references a claim under Title VII of the Civil Rights Act of 1964. (Compl. at 8).

**2.** Count 3 of plaintiff's complaint also references a claim under "Title VIII." (Compl. at 9).

**3.** In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff. Fed.R.Civ.P. 56.

checking out at the attendance area, but instead, the students re-entered the commons area. Plaintiff and her friend proceeded down the main hallway where classes were in session. Officer Targett began following the students. Plaintiff was angry that Officer Targett followed her down the hall and she complained to him about his following her. Officer Targett did not respond to plaintiff, but continued following the students. Defendants contend that Officer Targett asked plaintiff and her friend to leave the building several times, but plaintiff refused to leave. As noted, plaintiff contests this assertion. Plaintiff admits that she had a "bad attitude" and was "saying anything she could to make [Officer Targett] angry."

Plaintiff and her friend then proceeded into the library area where defendant Susan Cunningham, a library clerk, was working. Plaintiff was very loud and disruptive, and Ms. Cunningham asked her to be quiet. Plaintiff told Ms. Cunningham to "fuck off" and proceeded to the English IMC area and into the classroom of Charlotte Benaka. Ms. Benaka's classroom was full of students at the time.

Ms. Cunningham saw Officer Targett outside the door of the library, waved to him to enter, and told him about plaintiff's behavior in the library. Officer Targett went into the room where Ms. Cunningham indicated plaintiff and her friend had gone. Defendants contend that when Officer Targett entered the room, he told the two students they were being disruptive and again told them they were to leave the building. However, plaintiff testified that Officer Targett told plaintiff to "get the fuck out of the school" and pushed her into a file cabinet.

Ms. Benaka stated that when plaintiff came into her classroom, she was saying "fuck you" constantly, and when Officer Targett asked her to leave the room, plaintiff said, "I'm not fucking going" and "fuck you Targett." When Officer Targett attempted to get plaintiff out of Ms. Benaka's classroom, the plaintiff stated, "Get away from me you fucking pig." Plaintiff admits that she was trying to "upset" and antagonize Officer Targett.

Officer Targett testified that while in Ms. Benaka's classroom, he placed an open hand upon plaintiff's left shoulder to escort her out of the room. He further testified that plaintiff pulled away and hit him on the right forearm. Officer Targett testified that, in an effort to move plaintiff away from the other students and to control her physical outbursts, he had placed his hand on plaintiff to direct her out of Ms. Benaka's classroom. During the altercation, plaintiff yelled at Officer Targett, saying "You can't put your hands on me" and called him an obscene name. Plaintiff testified that Officer Targett did not simply place an open hand on her, but instead pushed plaintiff into a file cabinet. Ms. Benaka testified that she "felt that plaintiff was trying to injure Officer Targett."

Defendants contend that when plaintiff exited Ms. Benaka's classroom, plaintiff threw a can of soda at Susan Cunningham. However, plaintiff contends that when Officer Targett pushed her into a file cabinet, he did so with such force that it caused her to lose her grip on the can of soda pop she was holding. The can of soda missed Ms. Cunningham and hit the floor. Ms. Cunningham testified that she was fearful for her safety and the safety of others in the area.

Defendants contend that once plaintiff and Officer Targett were in the English IMC area, Officer Targett requested that she leave the school. Plaintiff and Officer Targett then engaged in physical contact. Ms. Cunningham testified that she saw plaintiff try to kick Officer Targett in the

groin at least two times. Plaintiff kicked at Officer Targett twice and kicked him in the right leg. Plaintiff testified that she struggled with Officer Targett, but she did not remember whether she kicked him. Plaintiff testified that she was trying to get away from him.

Officer Targett testified that he placed plaintiff in a "hold on her wrists" in an attempt to control her. However, plaintiff testified that Officer Targett did not have a hold of either of her arms. Plaintiff testified that Officer Targett:

> wouldn't let me go and I couldn't breathe and I kept fighting him. And we went across the hall to a[w]ater fountain and he held me pinned up against the wall there. Then he—the whole time I was trying to get away, and we ended up going across the hall into the other wall when I fell on the ground. I tried to get away again, he grabbed me again.

Plaintiff further testified that she struggled with Officer Targett and that:

> I couldn't breathe. I remember everything was going black. He wouldn't let me go. Nobody would help me, and I was screaming "Just let me go, just let me go[ ]" until the point where on the wall opposite the water fountain, I couldn't breathe and everything was starting to go black and we stopped against the wall and I remember him the—he was saying something to me and he loosened his grip and I started to try to get away again because I could breathe again.

While Officer Targett restrained plaintiff, he repeatedly told her to calm down and that she would be allowed to leave the building. Plaintiff does not recall what Officer Target said to her. Plaintiff believes that Officer Targett probably told her to "stop it or quit struggling or something along those lines." Plaintiff only recalls that she was trying to get away from Officer Targett during the physical altercation.

The school librarian, Clarke Green, heard plaintiff call Officer Targett a "pig" and say "fuck you" between ten and fifty times. Mr. Green was concerned for the safety of the students. Sherri Salle, a hall monitor, observed plaintiff using vulgarities and saw a can of soda come flying out of the inner classroom towards Ms. Cunningham. Stacy Smith, a teacher who was helping a student in the English IMC, was so concerned about the safety of other students, he placed himself between plaintiff and other students in the classroom to protect them from plaintiff's erratic behavior. Mr. Smith observed that plaintiff refused to leave the classroom and that she repeatedly used vulgarities and acted belligerently. Plaintiff admits that during this incident, she frequently used the word "fuck." Plaintiff further admits that she was causing a disturbance and that everyone in the English IMC area was watching her.

Officer O'Shea of the Shawnee County Sheriff's Department then arrived on the scene and placed plaintiff in handcuffs because of the disturbance she was causing. Plaintiff was eventually taken from the building, placed in a police car and taken to juvenile intake. Plaintiff was also taken by her parents to Saint Francis Hospital where her injuries were documented and photographed by a sheriff's officer. The sheriff's officer described the incident as battery.

## B. Disciplinary Notices

On the day of the incident, Mr. Weigle, the applied math teacher, filed a disciplinary notice with Mr. LaFevre against plaintiff, stating "[plaintiff] comes into my first hour class and says 'Brad you are a fucking son of a bitch and wait until you get out of this fucking class' and then walks off

when I ask her to stop." The disciplinary notice filed by Mr. Weigle and signed by Mr. LaFevre states that plaintiff had nine discipline points in her file. The disciplinary notice indicated that "[a]t six points you will be suspended from school for one to three days. A parent conference will be required for you to return to school. At 13 points you may be recommended for a long-term suspension for the remainder of the semester."

Based on plaintiff's actions in the administrative office in the presence of Ms. Thornburgh and Mr. LaFevre, Mr. LaFevre drafted a separate disciplinary notice for plaintiff. The notice stated "disrespect to two staff members, screaming profanities and threats, refused to remain in the office." The notice indicated plaintiff would incur five discipline points and a five-day suspension.

Mr. LaFevre also recommended plaintiff for a long term suspension in another separate disciplinary notice that cited plaintiff for "substantial disruption and interference with school operations; invaded and threatened rights of others; conduct at school constituting a misdemeanor if committed by an adult; disobedience of an order of a teacher, School Security Officer, and sheriff's deputy; and violation of the school code of conduct, assaulting a Police Officer and destruction of school property." Mr. LaFevre's request for a long term suspension indicates "request for long term suspension, parents called 9:30."

Mr. LaFevre also sent a letter to plaintiff's parents, Mark and Cheryl Sanders, identified as "Extended–Term Suspension of Andrea N. Sanders." The letter stated:

You are hereby notified that Andrea has been suspended for five (5) days effective Thursday, October 1st through Wednesday, October 7, 1998. The reason for this extended-term suspension is because Andrea caused substantial disruption and interference with school op-

erations; invaded and threatened rights of others; conduct at school constituting a misdemeanor committed by an adult; disobedience of an order from a teacher, school security Officer, and sheriff's deputy; destruction to school property; and assaulting a member of staff. Violation of the school code of conduct, an extended term suspension has been recommended for the remainder of this semester ending on January 15, 1999.

A due process hearing with respect to the recommended extended term suspension has been set for October 5th at 2:45 p.m. in the Auburn Washburn Administrative Offices, 5928 S.W. 53rd, Topeka, Kansas. Enclosed you will find a copy of the suspension and expulsion regulations of the school and Auburn Washburn Board of Education and the Kansas Student Suspension and Expulsion Law. Any further questions should be directed to the Clerk of the Board of Education of U.S.D. 437.... Signed by David LaFevre.

Mr. LaFevre also filed an official notice of short term suspension and sent the notice to the Board of Education.

## C. Hearings

The USD 437 School Board conducted a suspension hearing on October 5, 1998 at 2:45 p.m. Neither plaintiff nor her parents appeared at this hearing. Both of plaintiff's parents testified that they received notice of the suspension hearing. Plaintiff's parents were called on September 30 with notice of the October 5 hearing date. Mr. Sanders testified that although he wanted to attend the hearing and had made arrangements to be off work, his "relief didn't show up." Therefore, he testified he could not attend the hearing. In contrast, Mrs. Sanders never considered going to the hearing. Mr. Sanders testified that Mrs. Sanders did not attend the

hearing because "[s]he was afraid that Mr. Targett would be there and she would complete the job I felt like doing." Mr. Sanders further testified that this meant "kill him."

Mr. Sanders also testified that Mrs. Sanders had contacted the school to ask if the hearing could be postponed so they "could seek legal representation and /or a better time and they said no." Both Mr. and Mrs. Sanders acknowledged that they knew as of September 30, that they had the right to have legal representation at the hearing.

Assistant Superintendent Perry L. Perkins acted as the hearing officer at the October 5, 1998 suspension hearing. Present at the hearing were Principal Bill Edwards, Assistant Principal David LaFevre, Acting Board Attorney Barbara Norling, Hearing Officer Perry L. Perkins, and Clerk of the Board Coreena Barth. A summary memo of the action taken at the hearing was forwarded to plaintiff's parents. The hearing officer, Mr. Perkins made the following rulings at the hearing:

> Based upon the evidence and testimony presented at the hearing for Andrea Sanders, it is the decision of the hearing officer that Andrea Sanders be suspended long term from school beginning immediately for the remainder of the semester ending on January 15, 1999. Andrea Sanders may return to school at the beginning of the second semester, January 19, 1999.

A copy of the appeal statute K.S.A. 72–8904 is included with this notice. Note that an appeal must be submitted in writing to the Clerk of the Board within ten calendar days after receiving this notice. In the event of an appeal, Andrea Sanders will remain on suspension and not attend any classes or extracurricular activities in the Auburn Washburn school district until the appeal is heard and a decision is made.

Signed by Perry L. Perkins, the Hearing Officer.

## D. Subsequent Request by Plaintiff's Parents

Prior to plaintiff returning back to school for the spring semester in 1999, plaintiff and her parents met with Assistant Principal Mr. LaFevre, counselor Suarez and Officer Targett. Plaintiff's mother walked out of this meeting before it was concluded. Plaintiff testified about discussions at the meeting regarding the conditions for her return to school that "I know ... my mom requested that Targett wasn't there, that Targett wouldn't deal with me.... She asked if somebody else could handle me if I ever got in trouble, if somebody else could be called to deal with me." However, plaintiff did not recall the response from the school. About her return to school, plaintiff testified that:

> I just felt like there might be problems. I didn't feel like if anything happened, I would be treated fairly. I believed it would be my fault. That's why I wanted to go and ... go to my classes and that ended up not happening. A lot of things between my parents and [my] parents decided that them not wanting Targett to deal with me and the school and my parents couldn't agree on things and my parents ended up deciding that I just needed to leave.

The School Superintendent Howard Schuler and School Board President Stephan Angel sent a letter to plaintiff's parents on September 13, 1999, stating:

> You appeared before the Board of Education on August 2, 1999, concerning an incident that occurred on September 30, 1998 between your daughter Andrea, and an Auburn Washburn Security Officer, Jerry Targett. The Board of Education directed our attorney, Randy Baird, to thoroughly investigate the inci-

dent. Mr. Baird interviewed four teachers; Ms. Susan Cunningham, Ms. Charlotte Benaka, Mr. Stacy Smith and Mr. Clark Green, who all witnessed the incident. Mr. Baird recorded their statements and presented them to the Board. He also viewed the security video that captured the hallway struggle between your daughter and the security guard. Having watched this struggle, it became apparent that both individuals could have been bruised. The video provided evidence that there was not an unwarranted attempt[ ] by Mr. Targett to bruise Andrea's throat, face or any part of her body. He was trying to get her under control and remove her from the area. Witnesses stated that when Mr. Targett asked and directed Andrea to leave the area, she shouted obscenities at him, kicked him several times and refused to do what was being requested. One staff member called for additional security help and a school resource officer, Deputy O'Shea, arrived and placed handcuffs on your daughter and removed her from the premises.

The four witnesses did say that your daughter was totally out of control and one said, "I don't believe she would have complied with any reasonable request in any type of orderly manner." You are welcome to read the eyewitness' written reports if you should desire.

Based on the evidence presented, the Board of Education took no action towards any employee of the school district for doing their job. Signed Howard L. Schuler and Stephen Angel.

With respect to her constitutional claims, plaintiff testified that "I know they wouldn't listen to me. They never gave me a chance to speak on my rights . . . they never gave me a chance to be heard."

● **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest

upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

● **Discussion**

● **Availability of Fourth and Fourteenth Amendment Claims**

Defendants assert that plaintiff "must elect to seek protection under the Fourth Amendment for unreasonable seizure or to seek protection of her substantive due process rights as granted by the Fourteenth Amendment." (Defs.' Mem. at 30–31). Plaintiff cannot, defendants contend, "recover on both theories." (*Id.* at 30). The court does not agree.

In *Graham v. Connor,* the Supreme Court determined that claims against law enforcement officials for the use of excessive force in the course of a seizure of a free citizen should be analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. 490 U.S. 386, 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Therefore, under *Graham,* a claim against a law enforcement officer for conduct that arguably violates the Fourth Amendment must be brought pursuant to the Fourth, rather than the Fourteenth, Amendment. Defendants contend this standard applies to plaintiff's claims against defendants as public school actors and officials.

■ However, as defendants concede, no Supreme Court case has examined whether this limitation on the availability of constitutional claims applies in the public school context where a school employee, rather than a law enforcement officer, "seizes" a public school student. Instead, the Supreme Court has recognized in the public school context, the application of the Fourth Amendment's objective reasonableness standard in a limited form and the application of the Fourteenth Amendment's substantive due process protections against the use of unreasonable punishment. *See Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (noting the Fourteenth Amendment extends the constitutional guarantee against unreasonable searches and seizures "to searches and seizures by state officers ... including public school officials") (internal citations omitted); *Harris v. Robinson,* 273 F.3d 927, 930 (10th Cir.2001) (setting forth the inquiry for substantive due process claims in school discipline cases).

Absent a finding from the Supreme Court or other precedential authority dictating a contrary conclusion, the court finds that plaintiff may maintain both causes of action here where the evidence presented supports those claims.

● **Fourteenth Amendment Substantive Due Process Claim**

Defendants assert that they are entitled to judgment on plaintiff's substantive due process claim because there is "no evidence that Officer Targett represented that he was punishing Plaintiff for her actions." (Defs.' Mem. at 33). Defendants further assert that, even where plaintiff has stated a substantive due process claim, the evidence of record fails to reach the

"shock the conscience" standard necessary to take her claim to trial.

First, the court finds that when construing the evidence in the light most favorable to plaintiff, defendant Targett's conduct may be construed as "punishment" for plaintiff's disrespectful manner and her disobedience of school direction.

■ Next, the court examines whether the evidence of record is sufficient for plaintiff's substantive due process claim to proceed to trial. As set out by the Tenth Circuit, "[i]n school discipline cases, the substantive due process inquiry is 'whether the force applied caused injury so severe', was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Harris*, 273 F.3d at 930 (internal quotes omitted). To satisfy the "shock the conscience" standard, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir.1995).

■ The court finds that plaintiff has come forward with sufficient evidence to survive summary judgment on her substantive due process claim. According to the plaintiff, defendant Targett reacted to what he perceived as plaintiff's unwillingness to exit the school building following her suspension. After following plaintiff as she proceeded through the school halls, defendant Targett pushed plaintiff into a file cabinet, causing her to lose her grip on the can of soda she was holding. Plaintiff testified that after defendant Targett shoved her into the file cabinet, he again shoved her into another student and through a classroom door. Plaintiff testified that after pursuing her, defendant Targett then caught her and held her in a "head lock ... with his arms around [her]

neck." Plaintiff indicated that defendant Targett then dragged her across the hallway and "pinned" plaintiff "up against the wall" near a water fountain. Plaintiff further testified that she grabbed onto the water fountain as she struggled to get away from defendant Targett. The water fountain then fell off the wall when defendant Targett pulled plaintiff away from it.

Plaintiff testified that during the encounter with defendant Targett, she "couldn't breathe" and she remembered "everything was going black." Plaintiff perceived that defendant Targett "wouldn't let [her] go" although she kept screaming, "Just let me go." Plaintiff also testified that during the physical struggle with defendant Targett, no one would help her.

Although there is evidence in the record regarding plaintiff's combative nature on the day of her interaction with defendant Targett, there is conflicting evidence regarding the characterization of the physical struggle between plaintiff and defendant Target, the severity of that struggle, and the appropriateness of defendant Targett's reaction to plaintiff. However, when construing the facts in the light most favorable to plaintiff, as required by the summary judgment standard, the court finds that a reasonable jury could find that the conduct underlying plaintiff's substantive due process claim rises to the level of the "shock the conscience" standard articulated in *Harris*, 273 F.3d at 930. Defendants' motion is denied on this basis.

● **Fourth Amendment Unreasonable Seizure Claim**

Defendants assert that plaintiff's Fourth Amendment rights were not violated on the evidence presented. Instead, defendants argue that plaintiff was not "seized" at all, much less seized in a manner that violated her constitutional rights.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourteenth Amendment extends the constitutional guarantee against unreasonable searches and seizures "to searches and seizures by state officers ... including public school officials." *Vernonia Sch. Dist. 47J,* 515 U.S. at 652, 115 S.Ct. 2386 (internal citations omitted).

■ The central inquiry under the Fourth Amendment is whether a search or seizure is reasonable under all the circumstances of a particular governmental invasion of a person's personal security. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). To assess the reasonableness of a search or seizure, courts balance the governmental interest against the invasion which the search or seizure entails. *Vernonia Sch. Dist. 47J,* 515 U.S. at 652, 115 S.Ct. 2386. This balancing requires consideration of the context in which a Fourth Amendment right is asserted. This reasonableness inquiry in a public school context must take into account what is appropriate treatment for children in public schools and consider a school's "custodial and tutelary responsibility for children." *See id.* at 656, 115 S.Ct. 2386. Moreover, although Fourth Amendment protections apply to public school children, students in the school environment have a "lesser expectation of privacy than members of the population generally." *Id.* at 657, 115 S.Ct. 2386 (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 348, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

■ The court finds that plaintiff has come forward with sufficient evidence to survive summary judgment on her Fourth Amendment claim. The evidence presented, when construed in the light most favorable to plaintiff, indicates that plaintiff was not free to leave the school building during the physical struggle with plaintiff and that defendant Targett's use of force may not have been reasonable under the circumstances. *See Tennessee v. Garner,* 471 U.S. 1, 7–8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (noting the "reasonableness" of a seizure "depends not only on *when* it is made, but also on *how* it is carried out").

Here, the court must balance plaintiff's interest in being free from detention when departing the school's premises with the school's interest in ensuring plaintiff left the school premises following her suspension without disruption to other students. *See Vernonia Sch. Dist. 47J,* 515 U.S. at 652–53, 115 S.Ct. 2386 (noting the balancing required between plaintiff's interest in being free from seizure with a governmental interest). Although a school has an interest in ensuring the cooperation of students to follow school orders in a non-disruptive fashion, the court must examine the seizure in light of all the circumstances.

Although there is contradictory evidence about the nature of plaintiff's struggle with defendant Targett and the appropriateness of his use of force to detain her, the court finds that, when viewing the facts in the light most favorable to plaintiff, a reasonable jury could conclude that defendant Targett's detention of plaintiff was not reasonable under all the circumstances in the public school setting. *See Whren v. United States,* 517 U.S. 806, 818, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (noting that the balancing of factors to determine reasonableness of seizure is appropriate where seizure is conducted in an extraordinary manner, i.e., one unusually harmful to an individual's privacy or physical interests). Defendants' motion is denied on this basis.

### ● Qualified Immunity

Defendants assert that "the individual defendants are entitled to qualified immunity" for the "discretionary acts undertaken in their capacities as government employees." (Defs.' Mem. at 40–41). The court addressed this argument in it order analyzing defendants' motion to dismiss. Defendants raise no new arguments in the pending motion regarding qualified immunity. Accordingly, the court again finds, based upon its analysis in its prior order, that the defendants have not demonstrated an entitlement to qualified immunity.[4]

### E.  State Common Law Claims

### ● Intentional Infliction of Emotional Distress

■ Defendants assert the evidence presented fails to support a claim for intentional infliction of emotional distress pursuant to Kansas state law. To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: "(1) [t]he conduct of the defendant must be intentional or in reckless disregard of the plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress must be extreme and severe." *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Med. Ctr.,* 233 Kan. 267, Syl. ¶ 3, 662 P.2d 1214 (1983)).

■ For plaintiff's claim to survive summary judgment, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Id.* (citing *Roberts v. Saylor,* 230 Kan. 289, Syl. ¶ 2, 637 P.2d 1175 (1981)). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Med. Ctr.,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

■ The court finds that reasonable fact finders might differ as to whether defendant Targett's conduct was so extreme and outrageous as to permit recovery. First, reacting with severe force to the insubordinate behavior of a ninth grade student is not the not the kind of behavior that the court believes Kansas courts would equate with "mere ... indignities, threats, annoyances, petty expressions, or trivialities." *Dotson v. McLaughlin,* 216 Kan. 201, 210, 531 P.2d 1, 8 (1975). Additionally, the court finds that a reasonable person, upon examining defendant Targett's behavior in the light most favorable to plaintiff, could spontaneously exclaim, "Outrageous!" *Id.*

Next, the court finds plaintiff has met her burden to demonstrate that her emo-

---

4. The court notes that although all individual defendants appear to assert entitlement to qualified immunity, neither defendants' summary judgment motion nor their motion to dismiss addresses the viability of this defense as to each of the individual defendants. Because the two-part qualified immunity analysis requires a fact specific determination, the court is unable to determine the viability of this defense without defendant-specific arguments. *See Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 516 (10th Cir.1998) (noting two part test), *aff'd,* 254 F.3d 941 (10th Cir.2001).

tional distress due to defendants' behavior "was sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it." *Land v. Midwest Office Tech., Inc.,* 114 F.Supp.2d 1121, 1145 (D.Kan.2000) (citing *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175, 1179 (1981)). The court's focus is on whether plaintiff's feelings of fear, anger, or worry were severe. *See Roberts,* 230 Kan. at 292–93, 637 P.2d at 1179. Courts have looked to whether a plaintiff needed mental counseling as an indicator of the distress's severity. *See Land,* 114 F.Supp.2d at 1145 ("plaintiff has presented evidence of her psychological evaluation . . ."); *Price v. Automotive Controls Corp.,* No. 90–1193, 1992 WL 190680, at *8 (D.Kan. July 15, 1992) ("Her feelings of depression and anxiety were so severe that she required mental health counseling.").

Here, plaintiff has presented evidence that she underwent mental health counseling. Plaintiff presented evidence that she was in therapy at the time of her altercation with defendant Targett and that the social worker counseling her indicated that she could not successfully return to school if she would come into contact with defendant Targett. In addition, when plaintiff was tardy one morning when she attempted to return to school and she learned defendant Targett was *going to be involved* in the school's reaction to her tardiness, plaintiff "ran out of the school in fear." (Pl.'s Mem. at Exh. G). Based on the evidence presented when viewed in the light most favorable to plaintiff, the court finds that a reasonable fact finder could conclude that plaintiff's mental condition was "sufficiently severe, genuine and extreme." *Land,* 114 F.Supp.2d at 1145. Accordingly, the court denies defendants' motion for summary judgment on this claim.

- **Claims for "Trauma of the Occurrence; Past, Present and Future Mental Suffering; Degradation of Family Relationships and Future Emotional Distress"**

Defendants assert that the listed claims are not proper causes of action pursuant to Kansas state law. In response, plaintiff concedes that she does not assert the listed claims as separate causes of action. Instead, plaintiff asserts that these claims are alleged only as damages. Accordingly, the court finds plaintiff has not stated a claim for these causes of action and hereby dismisses them to the extent they appear to be stated as separate claims for relief. Defendants' motion is granted on this basis.

- **Immunity Under Kansas Tort Claims Act**

Defendants contend that they are immune from liability for plaintiff's common law claims pursuant to the discretionary function exception to the Kansas Tort Claims Act, Kan. Stat. Ann. § 75–6104. Defendants raised this argument in their prior motion to dismiss. For the reasons set forth in the court's order addressing defendants' motion to dismiss, defendants' motion is denied on this basis.

- **Order**

IT IS THEREFORE ORDERED that defendants' Motion for Summary Judgment (Doc. 63) is granted in part and denied in part.

THEREFORE, following this order of the court, plaintiff's claims available to proceed to trial are as follows:

- Count 2: Fourth Amendment claim for unreasonable seizure;
- Count 2: Fourteenth Amendment claim for substantive due process;
- Count 2: Title VII claim;[5]

---

**5.** Although defendants' Motion for Summary Judgment asks the court to grant defendants

summary judgment on all counts, no argu-

- Count 3: Title VIII claim;[6]
- Count 6: Intentional Infliction of Emotional Distress;
- Count 7: Assault; and
- Count 8: Battery.

**IT IS SO ORDERED.**

ments address the viability of plaintiff's claims under Title VII.

6. Although defendants' Motion for Summary Judgment asks the court to grant defendants summary judgment on all counts, no arguments address the viability of plaintiff's claims under Title VIII.